1  Lawrence Lessig
   Anthony T. Falzone (SBN 190845)
2  David S. Olson (SBN 231675)
   STANFORD LAW SCHOOL CENTER FOR
3  INTERNET AND SOCIETY
   559 Nathan Abbott Way
4  Stanford, California  94305-8610
   Telephone:  (650) 724-0517
5  Facsimile:  (650) 723-4426
   E-mail:  falzone@stanford.edu
6
   Mark A. Lemley (SBN 155830)
7  Matthew M. Werdegar (SBN 200470)
   KEKER & VAN NEST LLP
8  710 Sansome Street
   San Francisco, California  94111
9  Telephone:  (415) 391-5400
   Facsimile:  (415) 397-7188
10 E-mail:  mwerdegar@kvn.com

11 Bernard A. Burk (SBN 118083)
   Robert Spoo (pro hac vice)
12 HOWARD RICE NEMEROVSKI CANADY
   FALK & RABKIN, P.C.
13 Three Embarcadero Center, 7th Floor
   San Francisco, California  94111-4024
14 Telephone:  (415) 434-1600
   Facsimile:  (415) 217-5910
   E-mail:  bburk@howardrice.com
15
   Attorneys for Plaintiff
16

17              UNITED STATES DISTRICT COURT

18             NORTHERN DISTRICT OF CALIFORNIA

19                    SAN JOSE DIVISION

20

21 CAROL LOEB SHLOSS,                    CASE NO.

22         Plaintiff,

                                         COMPLAINT FOR DECLARATORY
23     v.                                JUDGMENT AND INJUNCTIVE
                                         RELIEF
24
                                         DEMAND FOR JURY TRIAL
25 STEPHEN JAMES JOYCE, in his individual
   capacity and in his capacity as a Trustee of The
26 Estate of James Joyce,

27         Defendant.

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1    Plaintiff Professor Carol Loeb Shloss ("Shloss"), by and through her attorneys, brings

2  this action and alleges against Defendant as follows:

3                              **NATURE OF THE ACTION**

4    1.    This is a civil action seeking declaratory judgment that Shloss's use of certain

5  written works on her proposed website does not constitute infringement of any copyrights that

6  Defendant is authorized to assert against Shloss.

7    2.    This case arises out of copyright litigation threats Defendant Stephen James Joyce

8  made against Shloss.

9    3.    Defendant's threats were intended to cause, and did cause, Shloss and Farrar,

10  Straus & Giroux  ("the Publisher") to cut significant documentary support for Shloss's scholarly

11  thesis from her manuscripts that were ultimately published as her book, *Lucia Joyce: To Dance in*

12  *the Wake* (2003) (the "Book").

13    4.    After the Book's publication in redacted form, Shloss prepared a website (the

14  "Website") that hosts an electronic supplement to her Book (the "Electronic Supplement") in order

15  to present necessary documentary support that serves, in connection with her critical and analytical

16  commentary, to enrich the scholarly nature of her Book. Defendant once again threatened Shloss

17  and demanded that the Website never be made public. Shloss now seeks a declaratory judgment

18  that her uses of materials on the Website do not infringe any copyrights controlled or owned by the

19  Defendant.

20    5.    This action is related to another action filed by Shloss, Northern District Case No.

21  C 06-3718 JW HRL.  In that action, Shloss seeks declaratory and injunctive relief against the

22  Estate of James Joyce, and Sean Sweeney, a Trustee of the Estate.  Shloss did not name Stephen

23  James Joyce as a defendant in that action because she was not certain he was an official Trustee of

24  the Estate when she filed her original complaint in that action.  Nor was she aware that Stephen

25  Joyce directly owned or controlled copyrights in the works of Lucia Joyce.  Upon learning that

26  Stephen Joyce claims to be a Trustee of the Estate, and the sole owner of copyrights in the works

27  of Lucia Joyce, she sought to add him as a defendant to the original action she filed, but the

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1  Defendants in that action refused to agree to that amendment.  Accordingly, Shloss files this

2  separate action against Stephen James Joyce personally and as a Trustee of the Estate.

3  <u>**THE PARTIES**</u>

4  6.  Shloss is an Acting Professor of English at Stanford University, and a resident of

5  Stanford, California. Shloss received a B.A. at Swarthmore College, an M.A. at Harvard

6  University and her Ph.D. from Brandeis University. She has taught at Wesleyan University, the

7  University of Pennsylvania and West Chester University of Pennsylvania. She has held

8  fellowships from the National Endowment for the Humanities, the Rockefeller Foundation, and the

9  Mellon Foundation. In 1994 she won the Fellowship for Creative Non-Fiction Writing from the

10  Pew Fellowships in the Arts. Prior to coming to Stanford, she held research positions at the Center

11  for the Humanities at Wesleyan University, the Bunting Institute of Radcliffe College at Harvard,

12  the Center for Documentary Photography at Duke University, the Rockefeller Institute at Bellagio,

13  Italy, the Alice Paul Research Center at the University of Pennsylvania, the Center for the Cross

14  Cultural Study of Women at Oxford University, and the Harry Ransom Humanities Research

15  Center at the University of Texas at Austin.

16  7.  Until recently she served on the editorial boards of the *Joyce Studies Annual* and

17  *College Literature*. She is the author of four books: *Flannery O'Connor's Dark Comedies*, *In*

18  *Visible Light: Photography and the American Writer*, *Gentlemen Photographers*, and, most

19  relevant to this litigation, *Lucia Joyce: To Dance in the Wake*, a book about Lucia Joyce and the

20  creative impact of Lucia's relationship with her father, the Irish expatriate author James Joyce, on

21  James Joyce's literary works. At Stanford, Shloss teaches courses on James Joyce, Virginia Woolf,

22  Women Writers and the Modern Experimental Novel, Modern Irish Literature, Modernism and the

23  Cinema, Novels into Film, and Jane Austen on Film.

24  8.  Defendant Stephen James Joyce is a natural person who, upon information and

25  belief resides in France.  Upon information and belief, Defendant is an agent, beneficiary and

26  Trustee of the Estate of James Joyce (the "Estate").  Through the Estate and in his own name,

27  Defendant asserts to own and control copyrights in the works and papers of James.  Accordingly,

28

2

1  the actions of the Estate are attributable to Defendant, and the actions of the Defendant are

2  attributable to the Estate.

3        9.     Defendant also asserts to personally own and control copyrights in the papers of

4  Lucia Joyce, the daughter of James Joyce.

5                **JURISDICTION AND VENUE**

6        10.    This Court has original jurisdiction over the subject matter of this lawsuit

7  pursuant to 28 U.S.C. §§ 1331 and 1338 because this case arises under the Copyright Act, 17

8  U.S.C. §§ 101 *et seq*. This Court also has jurisdiction under the Declaratory Judgment Act, 28

9  U.S.C. § 2201.

10       11.    A major source of Defendant's income comes from licensing rights to James

11  Joyce's works in the United States through the Estate of James Joyce (the "Estate").

12       12.    Defendant has, through the Estate, licensed James Joyce's works on numerous

13  occasions in the United States, including in California.

14       13.    On August 8, 2002, Defendant wrote to Shloss at her Stanford University address,

15  repeating his oft-mentioned opposition to her Book, restating his goal of protecting Joyce family

16  privacy, and forbidding her to use various materials concerning Lucia Joyce, including her medical

17  records and files, which, upon information and belief, Stephen Joyce does not physically or legally

18  control.

19       14.    After he was informed of Shloss's proposed Website and Electronic Supplement

20  to her Book, Defendant directed several letters to Shloss's counsel at the Stanford Law School

21  Cyberlaw Clinic expressing opposition to the Website and Electronic Supplement, rejecting

22  Shloss's fair use arguments, and stating that he and the Estate were prepared to enforce their

23  copyrights against her. Defendant also sent correspondence to the Provost of Stanford University,

24  Shloss's employer, stating his opposition to the proposed Website and Electronic Supplement.

25       15.    The Website and Electronic Supplement, if made available to the public, would

26  serve as a source of scholarly and educational benefits to persons throughout the United States,

27  including residents of California.

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1    16.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 1400(a) because

2    Defendant is an alien and thus is subject to personal jurisdiction in this Court, and therefore may

3    be found in this judicial district, and because a substantial part of the harm threatened to Shloss

4    occurred in this judicial district, where Shloss resides and works.

5                          **INTRADISTRICT ASSIGNMENT**

6    17.    For purposes of Local Rule 3-2(c) this action may be assigned district-wide

7    because this is an intellectual property case sounding in copyright.

8                    **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

9                    **THE LIFE AND WORKS OF JAMES AND LUCIA JOYCE**

10    18.    James Joyce was an Irish fiction writer and poet, widely considered to be one of

11    the most influential and innovative authors of the twentieth century. He is best known for his short

12    story collection *Dubliners* (1914), and his novels *A Portrait of the Artist as a Young Man* (1916),

13    *Ulysses*(1922), and *Finnegans Wake* (1939). In particular, *Ulysses* is considered by both the public

14    generally and by literary scholars as one of the most important works of the twentieth century.

15    19.    Lucia Joyce, daughter of James Joyce and Nora Barnacle, was born in Trieste,

16    Italy, on July 26, 1907.

17    20.    Lucia began taking dance lessons when she was fifteen, and this became her main

18    interest during her teens and twenties.

19    21.    She started to show signs of emotional distress in 1930. Carl Jung took her in as a

20    patient in 1934. Many other doctors, all with varying diagnoses, worked with her in ensuing years.

21    22.    Against her will and the will of James Joyce, her mother, Nora, and brother,

22    Giorgio, committed Lucia to a mental hospital when Lucia was 25, beginning her sporadic

23    confinement in psychiatric institutions that would last until her death on December 12, 1982.

24    23.    In her will, Lucia Joyce appointed Peter Francis du Sautoy, Frederic Lionel

25    Monro, and Jane Hester Lidderdale to act as trustees of the trust created by her will. Upon

26    information and belief, under the terms of Lucia Joyce's will, these trustees retained all of her

27    property rights, including copyrights. Income generated from these rights was to be split between

28    her brother Giorgio Joyce and Lucia's relative, Nelly Joyce.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1    24.    Defendant asserts that he has acquired the copyrights in all of the works of Lucia

2  Joyce and that he alone now owns and controls those rights.

3    **HISTORY OF THE DESTRUCTION OF PAPERS RELATED TO LUCIA JOYCE**

4    25.    People have destroyed documents about Lucia Joyce for over sixty years,

5  apparently due largely to the stigma that previous generations attached to young women who had

6  suffered emotional trauma. As a result, little of the public record remains. This dearth of

7  information characterized the special circumstances in which Shloss worked, and it explains the

8  special importance of even small amounts of documentary evidence in this case. Because James

9  Joyce wrote about Lucia in various creative and imaginative ways in *Finnegans Wake*, this

10  documentary evidence is of literary as well as biographical importance. In the generation of those

11  who knew James and Lucia Joyce personally, those who destroyed or suppressed letters were

12  Maria Jolas, Harriet Shaw Weaver, John Dulanty, Stuart Gilbert, and the family of Charles Joyce.

13  Upon information and belief, in 1988 Defendant announced publicly that he had destroyed all of

14  his letters from Lucia as well as correspondence to Lucia from the famous Irish author, Samuel

15  Beckett. Upon information and belief, in or around 1992 Defendant persuaded officials at the

16  National Library of Ireland to allow him to remove Joyce family papers, including papers

17  pertaining to Lucia, from the Paul Léon Papers, an important collection of Joyce materials that the

18  National Library of Ireland was about to open to the public.

19    **SHLOSS'S FIFTEEN YEARS OF SCHOLARLY WORK ON THE BOOK**

20    26.    Shloss began research on Lucia Joyce in 1988, when she traveled to Paris to

21  consult Lucia's dance archives at the Bibliothèque de l'Opéra and the Rondelle Collection of the

22  Performing Arts at the Bibliothèque de l'Arsenal.

23    27.    Because these two libraries provided interesting material about Lucia Joyce's

24  dance career, Shloss expanded her search for records of Lucia's Parisian dancing at the Henry W.

25  and Albert A. Berg Collection at the New York Public Library and the New York Library of the

26  Performing Arts.

27

28

1       28.     During this time, Shloss began studying at the Institute for Psychoanalytic

2  Psychotherapies in Bryn Mawr, Pennsylvania, in order to understand the issues involved in

3  diagnosing and treating "schizophrenia" from an historical perspective.

4       29.     Shloss's early research was supported by West Chester University, which,

5  between the years of 1987 and 1995, provided her with nine research grants from the Office of the

6  Dean of Arts and Sciences in the form of Research and Publication Awards and Faculty

7  Development Awards.

8       30.     In 1990, Shloss traveled to the McFarlin Library, Poetry and Rare Books

9  Collection (Tulsa, Oklahoma) to consult the Richard Ellmann Archives. (Ellmann is a major

10  biographer of James Joyce.)

11       31.     In the spring of 1992, Shloss went to Zurich to expand her research on dance at

12  the Zentralbibliothek, the Hauptbibliothek, and the Kunstgewerbe Museum.

13       32.     While in Zurich, Shloss also consulted the C.G. Jung Archives at the E.T.H.

14  Bibliothek (Eidgenössische Technische Hochschule) and spoke to Peter Jung, Carl Jung's

15  grandson, about any documents concerning Jung's care of Lucia that might not be in the

16  possession of public institutions.

17       33.     Shloss then went to Dublin when the papers of Paul Léon, a friend and assistant of

18  Joyce, were opened to the public at the National Library of Ireland in the summer of 1992.

19  Shloss's work in Ireland consisted both of reading the Paul Léon papers and of discerning which

20  Lucia-related materials had been removed by Stephen Joyce from the archive before it opened.

21       34.     After constructing a list of the names of Lucia's doctors whose bills had not been

22  removed from the financial section of the Paul Léon papers, in 1993 Shloss went to the National

23  Library of the History of Medicine in Bethesda, Maryland. In Bethesda, she read, and when

24  necessary, translated from French and German, copies of the medical writings of Lucia's doctors.

25       35.     In 1994, Shloss received the Award for Creative Non-Fiction Writing from the

26  Pew Charitable Trusts in Philadelphia. This award allowed her to become a Visiting Scholar at the

27  Alice Paul Center for the Study of Women at the University of Pennsylvania (Fall 1994), and a

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1 fellow at the Centre for Cross-Cultural Research on Women at Oxford University, England, in the

2 Spring 1995.

3      36.     In the fall of 1994, Shloss traveled to Buffalo, New York, to consult the James

4 Joyce papers in the Special Collections Department at the Lockwood Memorial Library at the

5 University of Buffalo, New York.

6      37.     Shloss's research continued at Oxford in 1995. During this time she traveled

7 frequently to London to consult the Harriet Shaw Weaver papers at the British Library and the

8 Lucia Joyce papers at University College London.

9      38.     In 1996, Shloss returned to Tulsa to work once again with the Richard Ellmann

10 papers. She also visited the Harry Ransom Humanities Research Center at the University of Texas,

11 Austin, a repository for the Stuart Gilbert papers and for other of Lucia Joyce's papers.

12      39.     Soon thereafter Shloss received a Mellon Fellowship in Biography from the

13 University of Texas, which allowed her to return for a full month to use their collections in 1998.

14      40.     In both 1997 and 1998, Shloss was invited to be a Visiting Scholar at Stanford

15 University where she used the Lane Medical Library to further her research into the historical use

16 of pharmacology and to complete the writing of the first draft of her Book.

17      41.     Thereafter, Shloss made trips to consult manuscripts at Princeton University,

18 Cornell University, Southern Illinois University at Carbondale, the Archive of American Art at the

19 Smithsonian Institution, Washington D.C., the San Francisco Library of the Performing Arts, and

20 the Beinecke Rare Book and Manuscript Library at Yale University.

21      42.     In 2000, Shloss returned to Dublin for more work at the National Library of

22 Ireland and to use archives at University College Dublin and Trinity College Dublin.

23      43.     In the spring of 2003, Shloss was named Richard Ellmann Visiting Professor at

24 Northwestern University, where she completed the revisions and final copy-editing of her

25 manuscript.

26      44.     Shloss's Book describes the extraordinary influence that James Joyce's daughter

27 Lucia exercised on her father's emotions and work and challenges Lucia's conventional portrayal

28 as a troublesome blight on the Joyce family.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1    45.    As the Publisher made clear in a description of the Book issued upon publication,

2   there is an important connection between Shloss's archival research and the scholarly value of

3   *Lucia Joyce: To Dance in the Wake*: "Though most of the documents about Lucia have been

4   destroyed, Shloss has painstakingly reconstructed the poignant complexities of her life . . . ."

5                    **DEFENDANT'S THREATS AGAINST SHLOSS AND THE PUBLISHER**

6    46.    Upon information and belief, Defendant became aware of Shloss's scholarly

7   research into Lucia Joyce around 1994. Although Defendant had not contacted Shloss or discussed

8   her scholarly work on Lucia Joyce, he opposed her work.

9    47.    Upon information and belief, Defendant sought to interfere with Shloss's ability

10  to engage in Lucia-related scholarly research at various institutions including the Special

11  Collections Department at the Lockwood Memorial Library at the University of Buffalo, New

12  York, notwithstanding that Defendant cannot claim any ownership rights in the physical

13  documents relating to Lucia or James Joyce in various libraries' collections. These attempts at

14  interference were chilling and made Shloss's scholarly work more difficult.

15   48.    In 1996, Shloss wrote to Defendant and asked for his help on her Book, inquiring

16  if he had personal documents that he would allow her to see. In response to her letter, Defendant

17  stated in a letter dated March 31, 1996, that his "response regarding working with you on a book

18  about Lucia is straightforward and unequivocal: it is a definitive no." He then purported

19  specifically to prohibit Shloss from using any letters or papers by or from Lucia Joyce.

20   49.    Defendant wrote to Shloss again in a letter dated April 19, 1996, in which he set

21  forth a catalog of complaints about Joyceans and said that "[o]n Lucia's dancing career we have

22  nothing to say . . . ."

23   50.    51. Over the course of his communications with Shloss, the only item that

24  Defendant granted her permission to use—for a fee—was James Joyce's published poem *A Flower*

25  *Given to My Daughter*, but he later rescinded that permission, claiming that Shloss had tried to

26  "bypass" him by directing communications to Estate Trustee Seán Sweeney and former Estate

27  lawyer David Monro, instead of to him.  Defendant also refused permission so long as Shloss

28  intended to use certain other materials bearing on the life of Lucia Joyce.

1        51.    Upon information and belief, Defendant took other steps directly or indirectly,

2   without justification, to interfere with Shloss's Book project and her scholarly work on Lucia

3   Joyce, or to make that work more difficult.

4        52.    Though Shloss was disturbed and frightened by Defendant's attempts to obstruct

5   her scholarly work, she persisted in her publication plans. In August of 2002, as she neared

6   completion of the Book, Defendant again wrote to Shloss at her Stanford University address to

7   harangue against her Book. After reiterating that Defendant's position had not changed from its

8   expression in previous letters, he then "add[ed] a few 'things' you are not authorized to do and/or

9   use." (emphasis in original). First, Defendant purported to "forbid[]" the use of any of Lucia's

10  medical files and records, even though, upon information and belief, Defendant has no physical or

11  legal control over such medical records and cannot claim any copyright interest in them. Second,

12  Defendant again purported to forbid Shloss from using any materials created by Lucia. Finally, he

13  threatened Shloss by referring to recent copyright litigation that the Estate had engaged in, stating

14  that "[o]ver the past few years we have proven that we are willing to take any necessary action to

15  back and enforce what we legitimately believe in."

16       53.    After learning that the Book was to be published by Farrar, Straus & Giroux,

17  Defendant then switched his tactics and began threatening the Publisher. On or about November 4,

18  2002, Defendant called the Publisher to inform it that he had heard about the Book, that he was

19  opposed to any publication, and that he had never lost a lawsuit.

20       54.    Later that day, November 4, Defendant sent a letter to Jonathon Galassi, President

21  of Publisher Farrar, Straus & Giroux, to the same effect.

22       55.    The very next day, on November 5, 2002, Defendant again wrote to Mr. Galassi.

23  In the letter, Defendant claimed that since March 31, 2002, he is the "sole beneficiary owner" of

24  all of James Joyce's rights and that he runs the Estate jointly with the Trustee, Sweeney. He also

25  claimed, without explanation, and contrary to the public will and testament of Lucia Joyce, that he

26  is the sole owner of the rights to Lucia Joyce's works. Defendant tried to undermine publication of

27  the Book further by asserting that Shloss did not have permission to use letters written by Harriet

28

9

1   Shaw Weaver, Paul Léon, and Maria Jolas, whose copyrights, upon information and belief,

2   Defendant does not own or control.

3       56.     Leon Friedman, an attorney for the Publisher, wrote to Defendant on November 6,

4   2002, informing him that the Publisher considered Shloss's work to be protected by copyright's

5   fair use doctrine.

6       57.     On November 21, 2002, Defendant wrote to Leon Friedman. In the letter,

7   Defendant informed Friedman that he "should be aware of the fact that over the past decade the

8   James Joyce Estate's 'record', in legal terms, is crystal clear and we have proven on a number of

9   occasions that we are prepared to put our money where our mouth is." Defendant then remarked

10  that the Publisher's fair use claim "sounds like a bad joke or wishful thinking" and told Friedman

11  to "kindly bear in mind that there are more ways than one to skin a cat."

12      58.     In his November 21, 2002 letter to Friedman, Defendant again asserted that Lucia

13  Joyce's medical records should be off limits. Moreover, in response to Friedman's statement that

14  under copyright law a researcher has the right to make unauthorized use of "information"

15  contained in copyrighted material, Defendant replied that such "'material' was copyrighted in

16  order to protect the author's rights as well as those who inherit them . . . ."

17      59.     Defendant sent yet another letter to Leon Friedman, dated December 31, 2002,

18  which repeated his earlier threats: "As I indicated in my previous letter, there are more ways than

19  one to skin a cat! This is already proving to be true since certain pigeons from California are

20  coming home to roost with very ruffled feathers."

21      60.     The December 31, 2002 letter further stated that Shloss's Book "is strictly a Joyce

22  family matter to be dealt with by my wife and myself and is of no concern of/to the Trustee, Seán

23  Sweeney."

24      61.     Friedman sent a letter to Defendant on January 2, 2003, informing him that no

25  further correspondence was necessary because it was clear that Defendant would not grant

26  permission to use any copyrighted material and that therefore the Publisher would rely on fair use

27  in publishing the Book.

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1       62.    Defendant again wrote to Friedman on May 22, 2003, to "formally inform"

2 Friedman that "Shloss and her publishers are NOT granted permission to use any quotations from

3 anything" that Lucia "ever wrote, drew or painted."  Defendant explained that in his view ""fair

4 use does not apply to letters consequently no extracts from letters of any member of the Joyce

5 family can be used in Ms. Shloss' book and I, acting for both the Estate and Family, refuse to grant

6 such permission."  In this letter, Defendant explained that he has never "encountered a case where

7 an author, academic or otherwise, and his or her publisher refused to deal with me directly as is the

8 case in this instance."  *Id.*  Defendant continued, "[s]o be it.  I am perfectly willing to play the

9 "game" your way but there will be repercussions.  This is not a threat but a statement of fact…."

10       63.    Exactly two months later, on July 22, 2003, Joyce wrote Friedman another

11 unsolicited letter to remind Friedman, FSG and Shloss what was by now crystal clear:

12            Let me point out and stress, if need be, that the James Joyce Estate
and myself as the sole beneficiary owner hold any and all rights,

13            including copyright, to anything and everything that James, Nora .
. . , Giorgio (George), Lucia, Helen (Kastor Fleischman) Joyce and

14            myself ever wrote, drew, painted and/or recorded etc. . . .

15            In virtually all countries/nations and territories the world over there
are laws, International Conventions ad Statutory Instruments which

16            will uphold our intellectual property rights, including copyright
and moral rights.

17

18       64.    In his correspondence and communications with Shloss and her publisher,

19 Defendant asserted that as owner of Joyce copyrights he was entitled to protect and enforce the

20 privacy of Lucia and James Joyce (who are deceased) and of the living members of the Joyce

21 family. Upon information and belief, Defendant has frequently made public and private statements

22 asserting that his ownership of copyrights entitled him to protect and enforce the privacy of

23 deceased and living members of the Joyce family, including Lucia and James Joyce.

24    **SUPPRESSION OF PORTIONS OF SHLOSS'S BOOK IN RESPONSE TO
DEFENDANT'S THREATS**

25

26       65.    Notwithstanding the valid fair use defense of Shloss's use of Joyce-related

27 copyrighted materials, to avoid any risk of litigation, Shloss either forebore using certain

28 copyrighted materials as she wrote her Book, or she removed quotes that she had used in earlier

1  drafts of the Book.  In addition, after Stephen Joyce's communications with the Publisher and its

2  attorney Mr. Freidman, the Publisher cut additional significant amounts of the Joyce materials

3  quoted in the Book. On January 23, 2003, the Publisher emailed Shloss, describing the edits that it

4  thought necessary to avoid a suit from Defendant over the Book. These cuts included all

5  unpublished writing of James Joyce and Lucia Joyce.

6         66.    Shloss replied to the Publisher January 29, 2003. In her email she voiced concerns

7  that "the proposed cuts eliminate almost all of the evidence in the book," which undermined the

8  book's "scholarly integrity" and excluded the evidence it took her "12 years to assemble."

9         67.    Nevertheless, because of Defendant's threats, many of the proposed cuts were

10  made. Although some manuscript material was later allowed to be reintroduced into the Book, the

11  final edits resulted in at least 68 quotes being cut from the Book. The Book was published in its

12  cut-down form in December 2003.

13        68.    Many reviews of Shloss's Book praised Shloss for her provocative theory, but

14  nonetheless found her documentary support lacking.

15        69.    For example, the review of the Book in the *New York Times* observed that the

16  unsupported portions of Shloss's argument "damage[] the book's credibility, making it read more

17  like an exercise in wish fulfillment than a biography."

18        70.    The *New Yorker*'s review of the Book similarly focused on Shloss's documentary

19  support. The review questioned Shloss's "elevation of Lucia to the role of collaborator on

20  *Finnegans Wake*," remarking that "[t]he less Shloss knows, the more she tells us." Nevertheless,

21  "when [Shloss] has some information to go on," the review found Lucia Joyce's untold story to be

22  both "poignant" and "valuable."

23        71.    A review in the *San Francisco Chronicle* commended the Book for "giv[ing]

24  substance to a life that has previously been treated as a distracting footnote" and for "add[ing]

25  literary criticism of *Finnegans Wake* to illuminate Lucia's role as subject and inspiration that

26  deepened her father's writing." Yet the review then observed that "[m]any of the problems this

27  book presents to readers are probably due to the dearth of data." The review concluded by noting

28  that "[w]hile Shloss corrects errors and unlikely conjectures by Richard Ellmann (in his classic

1  James Joyce biography) and Brenda Maddox (in her biography of Nora Joyce), she adds a

2  daunting quantity of her own speculations, surmises and unconvincingly supported suppositions."

3  **THE PLANNED ELECTRONIC SUPPLEMENT**

4  72.    In 2005, Shloss began creating an electronic supplement to *Lucia Joyce: To*

5  *Dance in the Wake* (the "Electronic Supplement") and placed it on a website (the "Website") that

6  was and currently is password-protected and thus has not been made available to the public. The

7  electronic supplement is a resource by which scholars, researchers, and the general public will be

8  able to view additional supporting material for *Lucia Joyce: To Dance in the Wake*, including

9  material that was cut from the Book as a result of threats from Defendant and the Estate, material

10  that Shloss herself chose to remove for fear of attracting the negative attention of Defendant and

11  the Estate, and other additional material related to Shloss's scholarly analyses. When made public,

12  the Website will be accessible only within the United States to computers with a U.S. Internet

13  Protocol ("IP") address.

14  73.    The Electronic Supplement consists of relevant pages of the text of *Lucia Joyce:*

15  *To Dance in the Wake*, as published, supplemented in the margins by quotations that were cut from

16  Shloss's Book, as published, along with other quotations and commentary related to Shloss's

17  analyses. These quotations, which are visually keyed to the passages in Shloss's text to which they

18  relate, form part of her biographical commentary and criticism, and are taken from sources that

19  include James Joyce's published works, manuscript versions of Joyce's published works, Lucia

20  Joyce's unpublished works, and published and unpublished letters to, from, or about Joyce or

21  Joyce's family.

22  74.    Quotations in the Electronic Supplement drawn from Joyce's published works and

23  from published and Lucia's unpublished works as well as unpublished letters to and from members

24  of the Joyce family and community contain or convey important historical material that

25  documents, supports, and gives context to Shloss's critical analyses.

26  75.    Some quotations in the Electronic Supplement are taken from James Joyce's 1922

27  first edition of *Ulysses*, published in Paris by Shakespeare and Company. Though the Defendant

28  claims otherwise, this particular edition is in the public domain in the United States.

76.     Some quotations in the Electronic Supplement are taken from Lucia Joyce's own writings and provide important corroboration and context for Shloss's analyses.

77.     In addition the Electronic Supplement offers a visual and analytical illustration of the effects of the Estate's pressures on scholarly research and writing, and is thus itself an important commentary.

78.     On March 9, 2005, Shloss's counsel sent a letter to Defendant describing the planned Electronic Supplement. The letter explained that the Website would be restricted to U.S. access and stated that the omitted material was protected by copyright's fair use doctrine, and thus needed no permission, but nonetheless offered the Estate the opportunity to review the material before publication.

79.     Defendant replied through counsel on April 8, 2005, and asserted ownership of copyrights in all writings of James Joyce and Lucia Joyce and disapproved of the planned Electronic Supplement. The letter concluded by requesting that Shloss "respect . . . the Estate's legal rights and wishes in this matter."

80.     In a reply dated April 20, 2005, Shloss's counsel explained that the materials on the proposed Website could be used without permission under the fair use doctrine.

81.     On May 13, 2005, Defendant's counsel reiterated Defendant's disapproval of the planned Electronic Supplement. The letter criticized Shloss for not seeking a copyright license from Defendant and the Estate and declared that they "believe the proposed publication on the Internet to be an unwarranted infringement of the Estate's copyright and request again in the strongest terms that their legal rights on this issue be respected."

82.     Shloss's counsel replied on June 9, 2005, to explain that, in the United States, permission is not required to use material protected by fair use, and that therefore the observation that Shloss had not asked permission was irrelevant.

83.     On December 23, 2005, the Defendant's counsel informed Shloss's counsel that the Estate "does not give its permission for your client's proposed activities and rejects the notion that the proposed use could be made in the absence of consent under the fair use doctrine" and that it "reserves all rights if [Shloss] perseveres with her proposed activities."

14

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1              **DEFENDANT'S PRIOR PURSUITS OF LITIGATION**

2        84.      Pursuant to Defendant's numerous threats, Shloss reasonably fears that Defendant

3    will sue if she makes the Electronic Supplement on the Website publicly available in its present

4    form. Indeed, Defendant has not shied away from aggressive pursuit of litigation. For example, at

5    the urging and direction of Defendant, the Estate sued Cork University Press in 2000, shortly

6    before the planned publication of Cork's anthology *Irish Writing in the Twentieth Century*, edited

7    by David Pierce. The Estate also sued the editor, Danis Rose, and publisher, Macmillan Publishers

8    Ltd, for the 1997 publication of the Reader's Edition of *Ulysses*. Upon information and belief, the

9    Estate also sued certain Irish sponsors of an Internet webcast reading of *Ulysses*, which took place

10   on "Bloomsday" 1998, even though the event was supported by leading politicians in the Republic

11   of Ireland. ("Bloomsday" is celebrated every June 16 throughout the world as the day on which the

12   fictional events of Joyce's *Ulysses* unfold.) In April 2004, the Estate sued Swiss wine producer

13   Provins Valais for its production of its "cuvée James Joyce" wines, which it had shipped to Ireland

14   in preparation for the 100th celebration of Bloomsday. In addition, in 2005 the Estate sued a

15   publisher based in Bath, England, Robert Fredericks Ltd, over its publication of a set of volumes

16   entitled "The Works of James Joyce in ten volumes."

17        85.      Upon information and belief, Defendant has threatened lawsuits on a number of

18   other occasions. These occasions include the use of a portion of *Ulysses* in a performance called

19   "Molly Bloom, A Musical Dream" which took place at the Edinburgh Festival Fringe in 2000.

20   Upon information and belief, that performance, which went forward as planned, was lawful under

21   the copyright law of the United Kingdom.

22            **DEFENDANT'S UNCLEAN HANDS AND ACTS OF MISUSE**

23        86.      In addition to Defendant's attempts to interfere with Shloss's research on Lucia

24   Joyce, to stop publication of Shloss's Book, and to damage her relationship with her employer,

25   Defendant has repeatedly misused the copyrights that he and the Estate control.

26        87.      Defendant has repeatedly represented that he is both a beneficiary of the Estate

27   and an agent of the Estate, in that he has claimed to control the Estate either solely, or jointly, with

28   the Trustee.  In addition, Defendant now asserts he is a Trustee of the Estate.

1    88.    Defendant has claimed the right to control Lucia Joyce's medical records and

2    files, in which, upon information and belief, neither he nor the Estate can claim copyright or

3    physical ownership. Defendant has also stated that "information" contained in copyrighted

4    writings and letters is controlled by him or the Estate by virtue of copyrights they purport to own

5    or control.

6    89.    For many years, Defendant has sought to prevent publication of materials and

7    information that might reveal new details about the private lives of James Joyce, Lucia Joyce, and

8    the Joyce family. In addition to consistently denying scholars and critics permission to quote from

9    James Joyce's unpublished letters, notwithstanding that the last published edition of James Joyce's

10   collected letters appeared in 1966 and hundreds of James Joyce letters have come to light since,

11   Defendant has repeatedly misused his control of copyrights in James and Lucia Joyce's works in

12   an effort to prevent the publication of materials and information about Joyce or the Joyce family

13   over which Defendant has no rights or control.

14   90.    Defendant has also acted to prevent the scholarly use of materials about the

15   private lives of James Joyce and the Joyce family. For example, upon information and belief,

16   Defendant was allowed to remove Joyce family papers, including papers pertaining to Lucia Joyce,

17   from the archives of the National Library of Ireland before those papers could be made available to

18   the public in 1992.

19   91.    Upon information and belief, Defendant also publicly announced in 1988 that he

20   had destroyed all of his letters from Lucia Joyce as well as correspondence to Lucia from the

21   famous Irish author, Samuel Beckett, in order to protect and enforce the privacy of Lucia Joyce

22   and the Joyce family.

23   92.    Defendant's hostility towards Shloss's Book comports with his customary

24   practice of aggressively leveraging copyrights to control rights that Defendant does not own, and

25   to protect non-copyright interests such as family privacy, including the alleged privacy of deceased

26   persons.

27   93.    Another example of Defendant's misuse is that he caused author Brenda Maddox

28   to delete the epilogue from her book *Nora: The Real Life of Molly Bloom* (Houghton Mifflin,

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1  1988), which discussed Lucia Joyce and her treatment. Even though, upon information and belief,

2  Defendant had no rights at that time to control Lucia-related information or the facts contained in

3  the epilogue, when he learned of the epilogue discussing Lucia he threatened to withdraw all

4  previously granted permissions to use any of James or Nora Joyce's materials. Upon information

5  and belief, neither Defendant nor his agents ever actually read Maddox's book or the epilogue.

6  Maddox eventually entered into an agreement the terms of which prevented Maddox and her

7  descendants from ever publishing the epilogue. Another contractual term barred Maddox from

8  criticizing Defendant or the Estate.

9       94.    Defendant similarly forced Catherine Driscoll, now a professor at University of

10  Sydney, to excise a chapter dealing with Lucia Joyce from her Ph.D. thesis by threatening to

11  withhold all permissions to quote from James Joyce's writings.

12      95.    Upon information and belief, on multiple occasions Defendant has denied

13  permission to quote from Joyce writings, or stated that he intended to deny such permission, in

14  retaliation for or as punishment for matters unrelated to the protection of copyright in Joyce

15  writings.

16      96.    In 1996 Professor Michael Groden, a Joyce scholar at the University of Western

17  Ontario, had a project to put *Ulysses* on a CD-ROM with annotated links to relevant multimedia

18  material (the "Multimedia *Ulysses*"). He received limited permission from Defendant to develop

19  prototypes of certain episodes of *Ulysses* for the purpose of applying for scholarly grants.

20      97.    Later, Professor Groden's Multimedia *Ulysses* project merged with a University

21  of Buffalo project so that *Ulysses* manuscripts, final text, and multimedia material would all be

22  included together. Also, the project changed from a CD-ROM project to one that would be

23  available on the Internet (the "Digital *Ulysses*").

24      98.    The Digital *Ulysses* project ended in 2003 when Defendant demanded of the

25  University of Buffalo an initial fee of between $500,000 and $1,000,000 for permission to proceed

26  with the project, in addition to a royalty percentage on eventual subscriptions to Digital *Ulysses*.

27  At certain other points, Defendant informed Professor Groden or his university that the permission

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1  fee for Professor Groden's original Multimedia *Ulysses* would be seven figures in euros or British

2  pounds.

3        99.    Defendant also informed the University of Buffalo that before Defendant's

4  permission to proceed with Digital *Ulysses* could be granted, certain other conditions had to be

5  satisfied, including exclusion from the project of all Irish organizations and institutions as well as

6  of the Zürich James Joyce Foundation and Centre.

7        100.    Another condition demanded by Defendant was that Professor Groden, the

8  scholar who had initially conceived a Multimedia *Ulysses* and who had labored for years to

9  develop it, be excluded from the Digital *Ulysses* project unless he agreed to provide Defendant

10  with information concerning the National Library of Ireland's purchase in May 2002 of certain

11  previously unknown James Joyce manuscripts, including a number of *Ulysses* manuscripts, from a

12  private source unconnected with Defendant. Professor Groden had served as a scholarly advisor to

13  this purchase, assessing the literary significance of the papers for the National Library of Ireland.

14  Although Defendant knew that Professor Groden's role was thus circumscribed, he made it a

15  condition of Professor Groden's participation in the Digital *Ulysses* that Professor Groden tell

16  Defendant "everything he knows" about the purchase, including information about the sellers'

17  legal title to the papers. Upon information and belief, Defendant had no legal interest in these

18  physical papers and did not challenge the purchase in litigation. The National Library had kept

19  details of the contemplated purchase and its negotiations confidential prior to publicly announcing

20  the acquisition. This had angered Defendant.

21        101.    Defendant's anger was expressed again shortly after the National Library of

22  Ireland announced its purchase of the James Joyce papers in May 2002, when Defendant phoned

23  Professor Groden to inform him that he would never again be allowed to quote from a Joyce text.

24  On another occasion Defendant wrote Professor Groden to vent his anger over Professor Groden's

25  role as scholarly advisor to the National Library of Ireland and other alleged instances in which

26  Professor Groden had acted "against the fundamental interests of the James Joyce Estate," and

27  informed Professor Groden that "[y]ou've made your bed and can now sleep in it."

28

1    102.    Again in January 2003, Defendant wrote a letter to Professor Groden, refusing

2  permission for Professor Groden to reproduce photographically in a scholarly publication certain

3  published facsimiles of page proofs for Joyce's *Ulysses*. Referring to the National Library of

4  Ireland's May 2002 purchase, Defendant added in the same letter that "days of reckoning usually

5  come when one least expects them and one of these has now come for you."

6    103.    In addition to the above examples, Defendant on other occasions has used his

7  copyright monopoly power to deny or discourage uses of Joyce materials that were permissible

8  under the copyright law.

9    104.    Further, upon information and belief, Defendant has on multiple occasions since

10  1997 asserted that the 1922 Paris first edition of *Ulysses* is protected by copyright in the United

11  States, notwithstanding that they knew or should have known that U.S. copyright laws provide to

12  the contrary with respect to that edition.

13                                **FIRST CAUSE OF ACTION**

14                                *Declaratory Judgment*

15          *1976 Copyright Act [17 U.S.C. §§ 101, et seq.] and 1909 Copyright Act*

16    105.    Shloss incorporates by reference the allegations in each of the preceding

17  paragraphs as if fully set forth in this paragraph.

18    106.    An actual controversy exists as to whether the material in the Electronic

19  Supplement infringes any copyright owned or controlled by the Defendant.

20    107.    *De minimis* quotations in the Electronic Supplement are noninfringing.

21    108.    Quotations of material in the U.S. public domain, including but not limited to the

22  1922 Paris first edition of *Ulysses*, are noninfringing in the United States.

23    109.    Material in the Electronic Supplement that does not quote or paraphrase any work

24  whose copyright is held by or administered by Defendant does not infringe any of Defendant's

25  copyrights.

26    110.    Shloss is entitled to a declaratory judgment that the Electronic Supplement does

27  not infringe any copyright of Defendant, and that the 1922 Paris first edition of *Ulysses* is in the

28

1  public domain in the United States and that Shloss's quotations from that edition in her Electronic

2  Supplement therefore cannot be infringing as a matter of law in the United States.

3                              **SECOND CAUSE OF ACTION**

4                          *Declaratory Judgment [17 U.S.C. § 107]*

5                                        *Fair Use*

6           111.    Shloss incorporates by reference the allegations in each of the preceding

7  paragraphs as if fully set forth in this paragraph.

8           112.    An actual controversy exists as to whether, in the planned Electronic Supplement,

9  Shloss's use of materials to which Defendant hold or administer copyright ("Defendant's

10 Material") falls within the fair use privilege.

11          113.    Shloss's uses of Defendant's Material in the planned Electronic Supplement are

12 for the purposes of scholarly, biographical research and literary criticism and commentary.

13          114.    Shloss's use of Defendant's Material in the planned Electronic Supplement is not

14 substantially commercial.

15          115.    Shloss's uses of Defendant's Material in the planned Electronic Supplement are

16 of reasonable length to accomplish her scholarly goals.

17          116.    Shloss's uses of Defendant's Material in the planned Electronic Supplement

18 establish historical and/or literary facts that are relevant to Shloss's scholarly works.

19          117.    Shloss's uses of Defendant's Material in the planned Electronic Supplement are

20 transformative because they alter Defendant's Material with new expression, meaning, or message.

21          118.    Shloss's uses of Defendant's Material in the planned Electronic Supplement have

22 little to no effect on the potential market for or value of Defendant's Material.

23          119.    Due to the purpose and nature of Shloss's work, her use of Defendant's Material

24 in the planned Electronic Supplement should be considered presumptive fair use.

25          120.    Shloss is entitled to a declaratory judgment that her use of Defendant's Material

26 in the planned Electronic Supplement is noninfringing fair use.

27                              **THIRD CAUSE OF ACTION**

28                              *Declaratory Judgment*

1    *Copyright Misuse*

2    121.    Shloss incorporates by reference the allegations in each of the preceding

3    paragraphs as if fully set forth in this paragraph.

4    122.    Shloss alleges, upon information and belief, that Defendant is using threats of

5    copyright infringement to unlawfully secure an exclusive right or limited monopoly not granted by

6    the copyright laws.

7    123.    Shloss alleges, upon information and belief, that Defendant knew or should have

8    known that Shloss's quotations in the planned Electronic Supplement constitute a fair use of

9    copyrighted material under 17 U.S.C. §§ 107 *et seq.*, or are otherwise noninfringing.

10    124.    Defendant engaged in the misuse of his copyrights, including in the letters he sent

11    or caused to be sent to Shloss and to her Publisher and University employer, by claiming that

12    Shloss's work constituted copyright infringement when Defendant knew or should have known

13    that it did not.

14    125.    Shloss alleges, upon information and belief, that Defendant's demand that Shloss

15    not use Lucia Joyce's medical records and uncopyrighted information contained in her works,

16    letters, and records, was an effort to secure an exclusive right or limited monopoly not granted by

17    the copyright laws.

18    126.    Shloss alleges, upon information and belief, that the Defendant is using threats of

19    copyright infringement to restrain Shloss's free speech and artistic expression in order to illegally

20    extend the scope of Defendant's copyright.

21    127.    Shloss alleges, upon information and belief, that Defendant engaged in misuse of

22    his copyrights when he sought to use legal threats against Shloss to protect the privacy of James

23    and Lucia Joyce (deceased persons) and the living Joyce family.

24    128.    Defendant engaged in the misuse of his copyrights, including the threats of legal

25    action in letters to Shloss and her Publisher, by claiming that the creation and dissemination of

26    *Lucia Joyce: To Dance in the Wake* constituted copyright infringement when he knew or should

27    have known that there was no infringement.

28

1    129.    Defendant engaged in the misuse of copyrights owned by him or the Estate,

2  including by threatening to withhold permission to use materials over which Defendant controlled

3  copyright from Brenda Maddox upon learning of Maddox's discussion of Lucia Joyce in the

4  epilogue to her book. Defendant's actions thus caused Maddox to remove information and

5  materials from her book over which Defendant had no legal control.

6    130.    Defendant engaged in misuse of copyrights owned by him or the Estate, including

7  by causing Professor Catherine Driscoll to excise a chapter dealing with Lucia Joyce from her

8  Ph. D. thesis by threatening to withhold all permissions to quote from James Joyce's writings.

9    131.    Upon information and belief, Defendant has used his limited copyright monopoly

10  to exact punishment or to gain leverage with respect to matters unrelated to the copyrights in

11  James and Lucia Joyce's writings. For example, Defendant engaged in misuse of copyright when

12  he attempted to use his permission-granting power to exact unrelated and unjustified contractual

13  concessions concerning Professor Michael Groden's role as scholarly advisor to the National

14  Library of Ireland, and when he denied copyright permissions to Professor Groden for the same

15  reasons.

16    132.    Defendant's misuse of copyrights owned by him or the Estate constitutes a pattern

17  and practice that has continued for many years.

18    133.    Defendant's misuse of copyrights owned by him or the Estate violates the public

19  policies underlying the copyright laws.

20    134.    Shloss is entitled to a declaratory judgment that Defendant's copyright misuse

21  prohibits copyright enforcement by Defendant against Shloss.

22                **FOURTH CAUSE OF ACTION**

23                *Declaratory Judgment*

24                *Unclean Hands*

25    135.    Shloss incorporates by reference the allegations in each of the preceding

26  paragraphs as if fully set forth in this paragraph.

27    136.    Defendant sent or caused to be sent letters to Shloss, the Publisher, and Shloss's

28  employer, Stanford University, that incorrectly claimed that Defendant was legally entitled to

1    prevent Shloss under the circumstances from making use of Lucia Joyce's letters, writings, and

2    other Lucia-related materials, and even her medical records and files.

3    137.    This directly impacted Shloss's scholarly work and compelled the Publisher to

4    suppress portions of Shloss's Book.

5    138.    Defendant sought to interfere with Shloss's work, including her archival research

6    at the University of Buffalo, in order to obstruct her scholarly efforts related to the Book.

7    139.    Shloss is entitled to a declaratory judgment that Defendant's unclean hands

8    prohibit copyright enforcement by Defendant against Shloss.

9                            **PRAYER FOR RELIEF**

10    WHEREFORE, Plaintiff requests that this Court enter judgment:

11    1.    Declaring that under United States copyright law, Shloss's Electronic Supplement

12    does not infringe any subsisting copyright owned by Defendant;

13    2.    Declaring that Shloss's activities with respect to the Electronic Supplement are

14    protected as fair use;

15    3.    Declaring that Shloss's transformative academic work is presumptively fair use;

16    4.    Declaring that Defendant was not entitled under the circumstances to prevent

17    Shloss from making use of the writings of Lucia Joyce or Lucia's medical records and files and

18    other Lucia-related documents;

19    5.    Declaring that Defendant cannot assert copyright infringement within the United

20    States of James Joyce's 1922 Paris first edition of *Ulysses*, because that particular edition is in the

21    U.S. public domain;

22    6.    Declaring that due to Defendant's copyright misuse he cannot assert copyrights he

23    controls against Shloss;

24    7.    Enjoining the Defendant, along with his agents, attorneys, and assigns, from

25    assertion of copyrights against Shloss regarding the materials on the Electronic Supplement on the

26    proposed Website;

27    8.    Awarding Shloss her reasonable attorneys' fees and costs; and

28

1          9.      Awarding such other relief as the Court deems just and proper.

2

3    Dated:  January **25**, 2007

4

5                                          STANFORD LAW SCHOOL CYBERLAW CLINIC
                                           CENTER FOR INTERNET AND SOCIETY

6                              By:  _____

7                                          David S. Olson
                                           *Attorneys for Plaintiff*
8                                          CAROL LOEB SHLOSS

9

10                              **DEMAND FOR JURY TRIAL**

11          Shloss demands a jury trial on all issues properly triable to a jury.

12

13   Dated:  January **25**, 2007

14

15                                          STANFORD LAW SCHOOL CYBERLAW CLINIC
                                           CENTER FOR INTERNET AND SOCIETY

16

17                              By:  _____

18                                          David S. Olson
                                           *Attorneys for Plaintiff*
19                                          CAROL LOEB SHLOSS

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1    **<u>CERTIFICATION OF INTERESTED ENTITIES OR PERSONS</u>**

2    Pursuant to Federal Rule of Civil Procedure 7.1 and Civil Local Rule 3-16, the undersigned

3    certifies that as of this date, other than the named parties, there is no such interest to report.

4    Dated:  January 25, 2006

STANFORD LAW SCHOOL CYBERLAW CLINIC
5    CENTER FOR INTERNET AND SOCIETY

6
By: _____
7    David S. Olson
*Attorneys for Plaintiff*
8    CAROL LOEB SHLOSS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28